**SO ORDERED.**

**SIGNED this 28 day of October, 2015.**

_Stephani W. Humrickhouse_
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

___

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| TIMOTHY JOSEPH ENNIS, | 14-02188-5-SWH |
| DEBTOR | |

**ORDER REGARDING MOTION FOR SANCTIONS**

A hearing on the debtor's motion for sanctions against creditor First Federal Bank was held in Raleigh, North Carolina on July 29, 2015. For the reasons set out below, the court will award compensatory damages in the form of attorneys' fees in a nominal amount commensurate with the nominal effort that it reasonably should have taken to fairly and expeditiously resolve this simple matter.

**FACTUAL AND PROCEDURAL BACKGROUND**

The debtor, Timothy Joseph Ennis, filed a petition under chapter 7 of the Bankruptcy Code on April 16, 2014. First Federal received notice of the filing on or about April 18, 2014, and engaged in the "normal steps" it takes when a client files a bankruptcy case. As has been First Federal's practice since April 2011, it coded the debtor's account as "bankruptcy" and activated a "no past due notifications" code in its computer system. However, unbeknownst to First Federal,

its system continued to generate and send monthly statements to Mr. Ennis. Exhibit D-3. As all concerned eventually would discover, the system contained an apparent blind spot with respect to the relatively small group of bank customers[1] (including Mr. Ennis) who received computer-generated billing statements, as opposed to the majority of First Federal's customers, who use payment coupon books or automatic drafts. The statements sent to Mr. Ennis differed in no material respect from those sent to him on a regular basis before he filed his bankruptcy petition; the problem, as First Federal readily acknowledged, is that they shouldn't have been sent at all.

On or about April 22, 2014, First Federal issued an account statement ("Loan Payment Notice") to Mr. Ennis.[2] It sets out the principal balance, the interest through April 21, 2014, the amount past due ($1,557.00), and a total amount due of $1,643.50. Conforming to those before it (and those that followed), the statement includes no demand for immediate payment or any other language that might be deemed inflammatory. At the hearing, Mr. Ennis testified that he thought the statement was "just a cross in the mail" type situation, and for that reason was "letting it slide and I felt that you know somebody didn't get the notice in time to get the letter stopped." Transcript at 18.

---

[1] First Federal's representative testified that 43 bank customers have filed bankruptcy petitions since April 2011. Of these, two other debtors have received account statements inadvertently sent by First Federal: One debtor received a single statement that was generated between the time he filed and the time First Federal received notice of the filing, and the other debtor received two statements for two collateralized loans before calling in to change to an auto-draft payment, which stopped issuance of computer-generated monthly statements.

[2] First Federal is listed as a creditor on the debtor's Schedule F, with the debt described as "bank fees." The statements show what appears to be a credit reserve line opened in 2002, with a principal balance of $1,727.97, and reflect that the last payment was made on October 15, 2012. On each of the notices, the "total amount due" increases incrementally, ultimately reaching $2,162.50 on the final October statement.

Mr. Ennis met with the Chapter 7 trustee on May 16, 2014, after which he felt "ecstatic, ... happy, [and] joyful" at the prospect of rebuilding his credit. On or about May 22, 2014, Mr. Ennis received another mailed statement from First Federal. As to this, Mr. Ennis testified as follows:

> As soon as I saw the envelope I knew exactly, I didn't even have to open the envelope to know what was inside it. And my stress level, I could feel – I'm a man of pride and I felt like this is, okay, maybe a mistake again, maybe give them a chance, they still didn't get the letter knowing that I filed and I was awarded my chapter 7.

Transcript at 19. The letter was, he said, "no big deal at the time." *Id.* at 20.

Later that month, on May 30, 2014, Mr. Ennis saw his physician. According to the medical records, the purpose of the visit was to seek treatment for extreme lower back pain resulting from an injury he incurred on or about May 6, 2014, when he picked up his dog, and also to address the status of his diabetes and high blood pressure, both of which are chronic conditions. The notes from this appointment state that Mr. Ennis's blood pressure was "not controlled." Exhibit D-1. Mr. Ennis's physician prescribed an additional medication for his blood pressure, as well as medications to address back pain, and scheduled a two-week follow-up visit to reassess back pain.

Mr. Ennis saw his physician for a follow-up appointment two weeks later, on June 13, 2014. Records of that appointment state that while his back pain was "much better," his last *two* blood pressure readings had been excessively high. At the hearing on the motion for sanctions, Mr. Ennis testified that the two high blood pressure readings to which these notes refer would have been taken at the May 30, 2014 appointment and at the appointment prior to that one, which would have taken place in March; in other words, Mr. Ennis's blood pressure was excessively high before he filed his bankruptcy petition in April. Mr. Ennis explained that he sees his physician with regard to his high blood pressure "about every three months." Exhibit D-1; Transcript at 47-49.

Asked by his attorney whether unfortunate events in Mr. Ennis's personal life (he injured his back while lifting his ailing 12-year-old dog in order to take her to the vet to be put down) might have in some way exacerbated his high blood pressure, Mr. Ennis stated his certainty that his pet's death did not contribute to his high blood pressure, but that the May statement did:

> No, absolutely not because I know that my – our animals are like family, I mean you have your grieving period. But then receiving that letter I knew that that was not fair to me and I live in such a low population county that you don't bring things up. Even though your doctor is not supposed to talk, people talk and I didn't want to bring up that I had gone through a bankruptcy and that I just received a letter saying that I still owe money. So I was feeling the pressure from that to begin with. Knowing that I thought maybe it was cross in the mail and it was oops, so that's – he just decided to prescribe another medication.

Transcript at 21-22.

On or about June 24, 2014, First Federal issued another notice. On June 25, 2014, Mr. Ennis contacted his attorney's office about the notices, and spent about five minutes on an exchange of emails. Exhibit D-2 (estimations of time expended as stated in debtor's responses to interrogatories). On June 27, 2014, a paralegal from Mr. Roland's firm sent a form letter to First Federal, stating that Mr. Ennis had filed a bankruptcy petition and including a paragraph about the automatic stay and the various activities precluded by it. The letter does not say that First Federal is in violation of 11 U.S.C. § 362, or specify what exactly First Federal is doing wrong: Instead, it identifies a generic range of disallowed activities and states that *if* the recipient is engaged in any of those things, the activity should stop. The letter was addressed to First Federal at the street address provided on the loan statements, rather than to the mailing address, which also is provided

on the loan statements and used in the creditor matrix. First Federal's representative testified that they did not receive it.[3]

An order granting Mr. Ennis a discharge under Chapter 7 was entered on July 17, 2014, served on First Federal at its mailing address, and received by First Federal on July 18, 2014. In response, First Federal coded Mr. Ennis's account as "discharged in bankruptcy" and left in place the "no past due notifications," per its standard operating procedures. On or about July 23, 2014, First Federal generated and sent another notice, in response to which Mr. Ennis exchanged emails with someone in his attorney's office for about five minutes on July 31, and for approximately fifteen minutes on August 5.

On or about August 22, 2014, First Federal sent another notice, in response to which Mr. Ennis spent about 10 minutes on an email exchange with his attorney's office. When asked on direct examination about the notices he received prior to discharge (April, May, and June), as well as the increasing amounts in the statements, Mr. Ennis testified as follows:

> I thought I was going to have to pay them. I thought I was going to have to still pay them back unless my attorney could get them to stop and understand what was wrong. All I wanted was the stoppage. All I wanted them to do is understand that look, Tim did his part, it's time to do your part. Sorry.
>
> Q: Did the amounts increase as the letters continued?

---

[3] First Federal can receive mail only at its mailing address. In its discovery responses, First Federal explained that U.S. Postal Service delivery rules preclude street address mail delivery in some situations that would require carriers to exit their vehicles, which in this instance affects First Federal because its physical location does not permit use of a curbside box. The policy makes it difficult for First Federal to consistently get all the mail sent to its street rather than mailing address, despite efforts to resolve the issue with the manager of the local office. "FFB's experience with its local post office's procedure to re-route its street address mail to its PO box is that sometimes FFB's mail makes it into FFB's Post Office box and sometimes it doesn't." First Federal's Responses to Interrogatories, No. 17.

>Yes. Yeah, I think it started around $1600, then it was by the end of it, it was over $2,000 and I'm thinking you know how am I going to do this? What do I have to do in my life to do it? So I talked to my lady and I told her, I said I think we're going to just have to wind up paying it. I said it's not fair but I said if I pay them am I going to have to pay somebody else? Then I filed. So that's when I kept contacting your office and in one letter I was like just please make it stop. That's what I wanted, just make it stop. I didn't ask for anything else.
>
>Q: And do you feel that your bankruptcy case is over now?
>
>No, it is not complete until this is over, until I can say that I can put it to an end, period. Once this is done it's done and I'll be happy then, I'll be joyful in my heart. That's all I want, I want things to stop.

Transcript 23-24.

Other than the initial form letter sent in June, no additional efforts to "make it stop" were undertaken on Mr. Ennis's behalf. There is no evidence that either Mr. Ennis or his attorney 1) attempted to call First Federal directly; 2) attempted to determine who represented First Federal in this district; or 3) attempted to send another letter - one which would have specifically mentioned that the statements were continuing to be sent to the debtor - to First Federal. Additionally, there is no evidence that at any point between the receipt of the first statement and the filing of the motion anyone from the debtor's attorney's office attempted to comfort the debtor by explaining that he was not liable for any pre-petition debt.

On September 12, 2014, Mr. Ennis saw his physician for a three-month follow-up, at which point his blood pressure readings were more favorable and deemed "controlled." Exhibit D-1. He and his counsel exchanged further emails on September 15 and on September 19, 2014, each exchange taking approximately five minutes of Mr. Ennis's time. On or about September 23, 2014, First Federal sent another notice, and Mr. Ennis spoke to Mr. Roland by phone for roughly twenty minutes. That same day, Mr. Roland filed a motion seeking to reopen the case and reimpose the

automatic stay in order to file an action for violations of the discharge injunction and the North Carolina Debt Collection Act. This motion was served on First Federal at the street address, not the mailing address. First Federal did not receive it.

On or about October 23, 2014, First Federal sent another statement. On October 29, 2014, Mr. Roland's office served another copy of the motion to reopen case on First Federal, again at its street address, but this time they sent it by certified mail. The local Post Office re-routed this certified letter to First Federal's P.O. box, where it was received.

The motion to reopen was First Federal's first indication that its system had erroneously generated post-petition statements. In response, it promptly investigated the situation and changed the coding to "no statements" rather than "no past due statements" to preclude any further mailings to Mr. Ennis. It also retained counsel, who contacted debtor's counsel within a few days to convey First Federal's offer to "pay any economic losses the Debtor had actually suffered to that date relating to the errant monthly statements, e.g., medical expenses, lost wages, attorneys' fees/costs, etc." First Federal's Reply Brief Opposing Mot. for Sanctions at 10. Counsel for the debtor was unwilling to provide details about harm and losses, instead stating that Mr. Ennis could be made whole based on "an increasing flat fee for each of the monthly account statements in question and a flat fee for additional 'actual damages' allegedly suffered by the debtor as of that time." First Federal's Mem. of Law at 19. Those discussions having failed to resolve the matter, First Federal filed a response in which it stated that it did not object to the motion[4] to reopen "to the extent the Debtor believes he has suffered compensable damages as a result of the monthly statements being

---

[4] First Federal did object to the motion to the extent that it sought to reimpose the automatic stay and/or to file an adversary proceeding. Counsel for the debtor ultimately withdrew those bases for the motion.

7

erroneously sent to him between April and October of this year, and wishes to present that claim to the Bankruptcy Court for appropriate redress." First Federal's Resp. to Mot. to Reopen Case at 1.

After the hearing on the motion to reopen, counsel for both sides engaged in further discussions, but these again proved unfruitful and on March 23, 2014, counsel for the debtor filed a motion for sanctions. First Federal filed a response in opposition to the motion, setting out in detail the circumstances surrounding generation of the statements, its non-receipt of the June 27, 2014 "warning letter" sent to its street address, and its quick correction of the problem once it learned that there was one. As defenses, First Federal stated that its mailings did not constitute "willful" violations of the automatic stay or discharge injunction, and further that the debtor failed to mitigate any damages he may have incurred in connection with receipt of the mailings.

Discovery ensued. In response to a request to itemize the amount of money the debtor sought to recover as compensation for medical problems, mental anguish and lost time, the debtor stated that he sought "actual damages," that those damages "are not liquidated and do not lend themselves to a statement of calculation," and that the damages would be proven through testimony of witnesses and documents produced in the case. Debtor's Responses to Interrogatories at 5. To the extent that Mr. Ennis did provide specifics, they establish that Mr. Ennis: 1) incurred a total of $164.05 in medical costs in connection with the appointments detailed above; 2) spent about an hour in contact with his attorney's office via email or telephone from June through September, up to and including the date on which the motion to reopen was filed; and 3) that while Mr. Ennis did not agree that he'd been "charged" any legal fees in connection with getting First Federal to cease sending the statements, he understood that he had "incurred" approximately $1,600.00 in legal fees up to and including the hearing on the motion to reopen. *Id.* at 3-5.

At the hearing on motion for sanctions, the court heard testimony from Mr. Ennis, from First Federal's representative Terri Williford, and – on the issue of mitigation of damages – from the debtor's counsel, Mr. Roland. In addition, First Federal's submission of a memorandum of law on the eve of the hearing prompted a request to file a post-hearing brief by Mr. Roland, which the court granted.[5] In that brief, Mr. Ennis requested an award of $5,000 in actual damages incurred by him as a direct result of First Federal's violations of the automatic stay. In addition, he sought an award of attorney's fees and costs as detailed in Mr. Roland's fee affidavit, which total $11,898.35.[6] Counsel for First Federal filed a brief in response to the memo and affidavit of fees, after which Mr. Roland filed a reply brief in support of his motion for sanctions. The matter is ripe for disposition.

## DISCUSSION

Section 362(k) provides in relevant part that "an individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees." Under the statute, a party seeking to recover damages for violation of the automatic stay must establish three elements: 1) that a violation of the stay occurred; 2) that the violation was willful; and 3) that the violation caused actual damages. 11 U.S.C. § 362(k). Violations of the discharge injunction are sanctionable under § 105, which authorizes bankruptcy courts to issue sanctions for violations of an order of the court where a party proves that the creditor violated the injunction, and that the creditor did so

---

[5] The court pointed out that the First Federal brief merely summarized the law in this circuit and had nothing in it that was "earth shattering" or surprising, and further opined that while counsel was free to file an additional brief, the court "[couldn't] imagine why you would need to."

[6] This amount does not include significant fees with respect to which Mr. Roland has chosen to not seek recovery, according to his fee affidavit: 1) $3000 in fees for work done by Mr. Roland; 2) unspecified fees for time spent communicating with Mr. Ennis and First Federal's counsel, including settlement negotiations; and 3) the $1,600 in fees that Mr. Ennis stated he had incurred through the hearing on the motion to reopen.

willfully. *In re Fina*, 550 Fed. Appx. 150, 154 (4th Cir. 2014) (citing *In re Barbour*, 77 B.R. 530, 532 (Bankr. E.D.N.C. 1987)). Also relevant for present purposes is Rule 9011-3(b) of the Local Rules, which provides:

> (b) SANCTIONS UNDER § 362(k). When determining sanctions under 11 U.S.C. § 362 (k), the court shall consider whether the moving party notified the offending party and gave the party an opportunity to cure the alleged violation.

### I. Violations of Automatic Stay and Discharge Injunction Occurred and were "Willful"

There is no dispute with respect to whether the statements issued by First Federal violated the automatic stay or the discharge injunction; they did, which First Federal readily acknowledges. With regard to the second element, a determination of willfulness, the court notes that in either the stay or discharge violation context, "[t]o constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *In re Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16 (1995). In both the automatic stay and discharge violation contexts, the same standards apply to determining whether an act was willful. *See In re Baxter*, 2015 WL 6122158 (Bankr. D. Md. 2015) (in context of discharge injunction, "courts in the Fourth Circuit have held that the standard to be used is the same as the standard for determining whether a violation of the automatic stay was willful"); *see also In re Mead*, 2012 WL 627699, at *3 (Bankr. E.D.N.C. 2012) (noting that while the other elements of civil contempt must be established by clear and convincing evidence, "a willful violation of the discharge injunction must be proven by the lower preponderance of the evidence standard") (citing *In re Cherry*, 247 B.R. 176, 188 n.18 (Bankr. E.D. Va. 2000)). Finally, a "good faith mistake is generally not a valid defense," and the offending creditors' "intentions and their apparent attempts to comply with the law are irrelevant." *Fina*, 550 Fed. Appx. at 154, 155.

Here, First Federal took prompt and responsive action when it received notices of the petition and issuance of discharge to ensure that Mr. Ennis received no bills, and believed that it had succeeded in doing so. Unfortunately, First Federal's coding system did not operate as planned and instead continued to issue statements to Mr. Ennis. The court is constrained to find that issuance of these statements was willful with respect to both the automatic stay and the discharge injunction.[7]

## II.    Whether Debtor Suffered "Actual Damages"

Under § 362(k), an injured party "shall recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages." The Bankruptcy Code does not specify the nature of an "injury" for which sanctions may be awarded under § 362(k), but generally speaking, the code recognizes that "a violation of another's legal right" constitutes injury. *Drake*, 2015 WL 393408, at *4 (quoting *In re Preston*, 333 B.R. 346, 350 (Bankr. M.D.N.C. 2005) (quoting *Black's Law Dictionary* 801 (8th ed. 2004)). Where a debtor incurs legal fees as a result of the violation, those fees constitute actual damages under § 362(k). Similarly, in the context of § 105(a), courts routinely award reasonable and necessary attorney's fees to debtors who incur them as a result of a willful violation of the discharge injunction. *E.g., Baxter*, 2015 WL 6122158, at *8 ("Almost every case this court has reviewed that found a willful violation of the discharge injunction has awarded attorney's fees."). Here, Mr. Ennis seeks to recover damages for "medical problems necessitating additional medication, mental anguish, and lost time in attempting to respond to First Federal's multiple collection efforts." Motion for Sanctions at ¶17.

---

[7] The court has qualms about the trend toward holding creditors to a standard of conduct wherein "willfulness" sheds the usual hallmarks of intent and increasingly seems to be subsumed within the first factor; *i.e.*, when a violation of the stay is established, then proof of that first factor seems to also prove the second. First Federal's arguments against this "strict liability" approach are well founded.

Considering each of these in turn, the court concludes that the allegations of harm to Mr. Ennis with respect to exacerbated medical problems and mental anguish are not borne out by the evidence. The discovery responses, testimony, and exhibits provide *no* plausible bases upon which the court could conclude that Mr. Ennis's receipt of the statements affected his physical health in any way. Instead, his testimony and medical records undermine that argument.

Mr. Ennis testified that he chalked up the first notice, in April, to simple error. He was bothered a bit by the second notice, in May, but thought that it too was "no big deal." There is no evidence from which the court could find that receipt of these statements worsened Mr. Ennis's high blood pressure, which Mr. Ennis's own medical records and testimony establish was an existing and increasingly serious health issue in the months before he filed his bankruptcy petition. While Mr. Ennis said that he suffered chest pain, anxiety, loss of sleep, headaches, and irritability as a result of the statements, there is no evidence that these required treatment or even merited a mention to his doctor (with the exception of headaches, which are cited as a component of Mr. Ennis's hypertension in all records up to and including the appointment in February 15, 2014). The records also make clear that the "additional medication" was prescribed for Mr. Ennis at the May 30 appointment for reasons that are demonstrably independent of his receipt, at that point in time, of two statements.

In June, after his receipt of a third statement, Mr. Ennis contacted his attorney's office. He presumably was at this point informed – at least, he certainly should have been – that the notices were sent in violation of protective bankruptcy laws and that he was not required to make payment or do anything further. While the motion states that he "suffered from increased anxiety and stress *because he did not have the money to pay First Federal*," the evidence did not bear this out. Motion

12

for Sanctions at ¶¶ 9-10.  That said, the court has no doubt but that Mr. Ennis found the whole unnecessarily protracted procedure stressful and unpleasant.  Most debtors do; even at its best, the bankruptcy process tends to be an unfamiliar and often-stressful endeavor for most people.

As outlined above, Mr. Ennis contacted his attorney about the First Federal notices upon his receipt of the third notice in June, and stayed in contact via email and a phone call throughout September.  Mr. Ennis's testimony suggested some confusion on his part about the sequence of events; he testified that he "filed" (apparently referring to his chapter 7 petition) in *response* to the escalating amounts due in the First Federal notices, which were sent post-petition; he testified in the next breath that because of his receipt of those statements, he "kept contacting" Mr. Roland's office requesting that they "just please make it stop."[8]  The court finds it hard to believe that Mr. Ennis could have experienced such emotional distress over the possibility that he might still owe First Federal monies.  He was represented by very capable counsel who most certainly would have explained to him that he would no longer owe First Federal upon his discharge.  Continued fretting over that possibility is simply not reasonable.

With all facts considered, the debtor has not established by even a preponderance of the evidence that the statements sent by First Federal were a proximate cause of any physical or emotional harm to him.  Rather, the evidence indicated that the statements are *not* connected *in any way* to the medical harms for which he seeks compensation, including his expenses related to the four physician visits and additional blood pressure medication.

---

[8] This testimony is troubling.  If true, the failure of Mr. Ennis's counsel to take any steps whatsoever to "make it stop" despite these communications from July through mid-September would constitute an appalling disregard for their client's interests.  Alternatively, the testimony may reflect confusion on Mr. Ennis's part, or it may simply not be credible.

With regard to his claims of emotional harm, it is true that damages for emotional distress in the context of a § 362(k) stay violation may, in some circumstances, be recoverable. *See, e.g., In re Thorpe*, 2011 WL 5909403, at *2 (Bankr. E.D.N.C. 2011) (awarding damages for "significant" emotional distress; bank representative arrived unexpectedly to perform lock-out at debtors' home, where male debtor was recovering from surgery, notwithstanding fact that bank had appeared in case on a motion for relief from stay). Here, while the evidence at least does not go so far as to weigh against the possibility, neither is there material support for Mr. Ennis's claims: Generalized "shock, disturbance and annoyance" simply do not rise to the level of real injury. *See In re Peterson*, 297 B.R. 467, 472 & n.2 (Bankr. W.D.N.C. 2003) (bank erroneously sent repossession notice, then apologized; in addition, bank debited debtor's account due to improper coding, then refunded the amount seven weeks later; deemed "nothing that would amount to an injury warranting damages," especially where it was "reasonable to assume that the Debtor's motion [for sanctions] – escalating the matter from a $500 problem to an over-$15,000 litigation – played a part in that delay"). Similarly, there are no grounds upon which to award damages for emotional distress or mental anguish under § 105(a) for violations of the discharge injunction. *See In re Walters*, 868 F.2d 665, 670 (4th Cir 1989); *In re Bock*, 297 B.R. 22, 29 (Bankr. W.D.N.C. 2002) (while debtor experienced "anxiety and concern," emotional distress damages are not recoverable in a civil contempt proceeding).

Finally, Mr. Ennis seeks to recover for the loss of his time. His discovery responses indicate that over a four month period, from June through September, he spent, at most, just over an hour dealing with the matter. Mr. Ennis has lost no time from work. Again, there is no compensable injury here.

For the foregoing reasons, the court finds that the debtor incurred no injuries or actual harm as a result of First Federal's violation of the automatic stay, *with the exception of any attorney's fees incurred in resolving the problem.* Fees are expressly designated as recoverable under § 362(k), and also may appropriately be awarded under § 105(a). The court stated at the sanctions hearing that the debtor's reasonable legal costs would be awarded, and First Federal has repeatedly articulated its willingness to pay the reasonable and actual attorney's fees incurred by the debtor up through the motion to reopen hearing. The court turns to the question of recoverable fees.

### III.     Debtor's Request for Fees

In an affidavit submitted to the court, counsel seeks recovery of fees and costs in the amount of $11,898.35, which represents $11,360.00 in fees and $538.35 for a transcript of the hearing on the motion for sanctions. The fees cover 6.6 hours of work by Mr. Shapiro, and 36.2 hours of work by Mr. Roland, the primary attorney in this matter. Mr. Roland states that he personally spent a total of 48.2 hours on this matter from March 20, 2015 through August 31, 2015, but "in the exercise of billing judgment, [has] chosen not to seek recovery for 12 of those hours, resulting in a total of 36.2 billed hours." The time frame covered by these fees begins with the motion for sanctions and goes through present day, including work done in connection with drafting the motion for sanctions, responding to and preparing discovery requests, preparing for and participating in the sanctions hearing, and then the preparation of a post-hearing memorandum in support of the motion.

The fee affidavit does not, however, include fees incurred in connection with the initial communications with Mr. Ennis, or the motion to reopen the case. As to this, Mr. Roland states:

> In exercising billing judgment, I have chosen not to seek recovery for certain additional tasks including but not limited to drafting emails to the debtor and [First Federal]'s counsel, settlement negotiations, and certain legal research. Additionally,

> I am choosing not to seek recovery for the fees incurred prior to and during the Motion to Reopen hearing held of December 17, 2014.

The fees incurred up through the motion to reopen the case are those that First Federal has offered to voluntarily pay.

First Federal, which has responded in exemplary fashion from the moment it became aware that a problem existed, offers this excellent summary of its position, which also serves as an ode to common sense and courtesy:

> Under these circumstances, First Federal respectfully submits that the Debtor should not be awarded any attorneys' fees and costs other than those incurred up to the filing of the Motion to Reopen. As Judge Small noted in the *Brock Utilities* case, a simple phone call to the creditor would likely "have resolved the situation and wholly avoided the necessity of a sanctions motion altogether." A single email on the Bankruptcy Section listserve asking for the name of First Federal's regular bankruptcy counsel would likely have entirely taken care of the substantive problem as well. Instead, the Debtor's attorney mailed First Federal a form letter that made no mention of the actual problem at hand, attempted to begin down a misdirected and very expensive litigation trail as the very next step to try to address the problem, and filed the instant Motion for Sanctions only after steadfastly refusing to detail for First Federal exactly what damages in what amount the Debtor believes First Federal should pay him as a consequence of sending him the errant monthly account statements in question. As in the *Brock Utilities* case, First Federal asks this Court to find that "any costs involved in bringing [the] motion were unnecessarily incurred and should not be reimbursed" to the Debtor.

First Federal Mem. of Law at 20-21.

Ironically, counsel for the debtor offers the following argument in response:

> "Litigation has something of the tennis game, something of war, to it; if one side hits the ball, or shoots heavy artillery, the other side necessarily spends time hitting the ball or shooting heavy artillery back." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004). While a party is entitled to vigorously defend the other party's claims in a fee-shifting matter, "once they do so they cannot then complain that the fee award should be less than claimed because the case could have been tried with less resources and with fewer hours expended." *Henson v. Columbus Bank & Tr. Co.*, 770 F.2d 1566, 1575 (11th Cir. 1985). *The attorneys' fees requested by Mr. Ennis are reasonable and necessary in light of [First Federal]'s aggressive defense of this matter.*

Debtor's Reply Brief in Support of Mot. for Sanctions at 3-4 (emphasis by the court).

The court finds the debtor's position to be astonishingly misguided, and agrees with First Federal, wholeheartedly. No fees over a minimal amount after the motion for sanctions was actually received by First Federal will be allowed. Excessive time and energy was expended by debtor's attorney when reasonable responses to First Federal's request for damages would have resulted in a quick and inexpensive resolution; no time-extensive research, discovery and brief writing was necessary. At the onset of the problem, if a properly worded and properly addressed letter had been sent to First Federal – one that actually told them what was happening – the statements would have immediately stopped. While that's precisely the goal of Local Rule 9011-3(b), that objective was not well served by the lukewarm notification and "opportunity to cure" afforded to First Federal.

The court sees many instances of egregious conduct on the part of creditors in blatant disregard of the automatic stay and discharge injunction, where real actual damages occur. This is not one of those cases. Based upon the court's experience with these matters, attorneys' fees in the amount of $1,750.00 will be allowed.

## CONCLUSION

The court will award the debtor attorney's fees in the amount of $1,750.00. No other compensatory damages were shown and will therefore not be awarded.

**SO ORDERED.**

**END OF DOCUMENT**